OPINION OF THE COURT
Geoffrey J. O’Connell, J.
The issue presented in this case is whether a sale of assets *775 constitutes a bulk transfer subject to article 6 of the Uniform Commercial Code or is exempt under UCC 6-103 (3) as having been made in settlement of a lien or other security interest. In lieu of testimony the parties have stipulated to a trial upon an agreed statement of facts with supporting exhibits.
Facts
On March 7, 1990, Interstate Cigar Company (Cigar Company) and Interstate Distribution, Inc. (Distribution Corp.) entered into an asset purchase and sale agreement pursuant to which Cigar Company sold certain assets to Distribution Corp., consisting of substantially all of the inventory and accounts receivable of its Health and Beauty Aids Division. The sale also included equipment, intangibles, contracts and leases of that Division. As part of the transaction Distribution Corp. assumed certain enumerated liabilities of Cigar Company. In the asset purchase and sale agreement, Distribution Corp. waived compliance by Cigar Company with article 6 of the Uniform Commercial Code (Bulk Transfers Article). UCC 6-105 requires that notice be given at least 10 days prior to a bulk transfer for it to be effective as against a creditor. Cigar Company agreed to indemnify Distribution Corp. for any liability arising from the noncompliance with UCC article 6.
Prior to the closing of the asset purchase and sale agreement between Cigar Company and Distribution Corp., CIT/ Manufacturer’s Hanover Inc. possessed a duly perfected first lien on the transferred assets.
Also on March 7, 1990, Distribution Corp. entered into an account financing agreement with Congress Financial Corporation (Congress Financial). Congress Financial perfected the security interest which it thereby acquired in the transferred assets by filing UCC financing statements. At the closing between Cigar Company and Distribution Corp., Congress Financial supplied the $18,258,238.43 paid by Distribution Corp. to CIT/ Manufacturer’s Hanover Inc. in exchange for the release of the latter’s lien on the transferred assets. This was the only cash exchanged.
The consideration given by Distribution Corp. for the assets it acquired from Cigar Company includes:
1. A payment of $18,258,238.43 by Distribution Corp. (loaned by Congress Financial) to CIT/Manufacturer’s Hanover Inc. in return for CIT/Manufacturer’s Hanover Inc.’s release of its lien on the assets transferred by Cigar Company.
*776 2. The assumption by Distribution Corp. of various accounts payable of Cigar Company in the amount of $7,383,217.
3. A promissory note from Distribution Corp. to Cigar Company in the principal sum of $1,800,000 dated March 7, 1990, payable in five years, with interest of 10% per annum payable quarterly.
4. Assumption by Distribution Corp. of Cigar Company’s obligations under certain enumerated leases.
5. Assumption by Distribution Corp. of Cigar Company’s severance pay obligations to certain of its employees.
6. Issuance by Distribution Corp. of 3,000 shares of its preferred stock to Cigar Company.
Pursuant to the asset purchase and sale agreement, Cigar Company agreed to remain liable for certain trade debts which were not assumed by Distribution Corp. Congress Financial was aware of the terms of the asset purchase and sale agreement when it advanced the $18,258,238.43.
Plaintiff Committee of Unsecured Creditors of Interstate Cigar Co. (Committee of Unsecured Creditors) consists of those creditors of Cigar Company whose debts were not assumed. An involuntary petition in bankruptcy under 11 USC chapter 7 (subsequently converted to chapter 11) has been filed by the creditors of Cigar Company and is pending in the United States Bankruptcy Court for the Eastern District of New York. The Bankruptcy Court has authorized plaintiff to bring this action in order to obtain a determination of liability after which the matter is to be returned to the Bankruptcy Court for the purpose of fashioning a remedy, if necessary.
Plaintiff Committee of Unsecured Creditors asserts that the title to the transferred assets conveyed by Cigar Company to Distribution Corp. was defective by virtue of the failure to give the notice to creditors required by UCC 6-105 and that the title which Congress Financial acquired in the proceeds of the transferred assets was similarly defective pursuant to UCC 6-110 (1). That statute provides that a transferee of property whose title is defective by reason of the transferor’s failure to comply with the Bulk Transfers Article conveys title having the same defect to any purchaser with notice of the noncompliance. It is conceded that Congress Financial had notice of the noncompliance with the Bulk Transfers Article.
Defendant Congress Financial contends that it took title free of any lien on the part of the unsecured creditors pursuant to UCC 6-103 (3) which provides:
*777 “The following transfers are not subject to this Article * * *
“(3) Transfers in settlement or realization of a lien or other security interest.”
Congress Financial argues that, since the $18,258,238.43 it advanced was used to satisfy CIT/Manufacturer’s Hanover Inc.’s perfected security interest in the transferred assets, the Bulk Transfers Article is inapplicable.
Applicable Law
Article 6, bulk transfers, as part of the Uniform Commercial Code, has.been adopted by a number of States and accordingly various courts have had occasion to construe UCC 6-103 (3). A review of these decisions identifies certain factors which are generally considered relevant in determining whether the transaction is subject to the Bulk Transfers Article or exempt by virtue of section 6-103 (3). (See, Annotation, What Constitutes “Transfers in Settlement or Realization of a Lien or Other Security Interest” Within UCC § 6-103(3) of Bulk Sales Transfer Act, 86 ALR4th 1104.) The factors to be considered include:
Was the transfer made to a secured creditor or nonsecured third party?
Was the debt secured by the assets in default at the time of transfer?
Was the entire value of the assets applied to the debt secured by the assets?
Were assets transferred in addition to those which secured the debt?
No single factor is controlling, but all must be weighed in determining whether the transaction is subject to or exempt from the Bulk Transfers Article.
In the instant case, the assets were transferred to a nonsecured third party, rather than to the secured creditor, and the transfer took place at a time when the secured debt was not in default. (See, Hixson v Pride of Tex. Distrib. Co., 683 SW2d 173 [Tex 1985]; Stone’s Pharmacy v Pharmacy Accounting Mgt., 812 F2d 1063 [8th Cir 1987]; Sutton Woodworking Mach. Co. v DKLS, Inc., 113 NC App 649, 439 SE2d 806 [1994].) While the entire proceeds of the loan advanced by Congress Financial were used to satisfy CIT/Manufacturer’s Hanover Inc.’s security interest in Cigar Company’s assets, Cigar Company received additional compensation for its assets from Distribution Corp. which were not used to pay the secured creditor. (Starman v John Wolfe, Inc., 490 SW2d 377 [Mo 1973]; Mid- *778 America Indus. v Ketchie, 767 P2d 416 [Okla 1989]; but see, Rockport Co. v Wedgewood, Inc., 447 NW2d 126 [Iowa 1989].) These consisted mainly of the assumption of other debt obligations including the $7,383,217 in accounts payable assumed by Distribution Corp., but also included the $1,800,000 note from Distribution Corp. to Cigar Company. While it does not appear that any assets other than those covered by CIT/Manufacturer’s Hanover Inc.’s security interest were transferred, three of the four relevant considerations point towards a finding that the transaction was a bulk transfer and not exempt under section 6-103 (3).
In arguing that the transaction should be exempt under section 6-103 (3), defendants rely primarily on American Metal Finishers v Palleschi (55 AD2d 499 [2d Dept 1977]). In American Metal Finishers, Harry Palleschi was a landlord who brought a summary proceeding against his tenant, CrownBastell, Inc. The tenant defaulted and Palleschi recovered a warrant of eviction and a money judgment. Before the Sheriff could levy upon the judgment, the tenant, Crown-Bastell, transferred all its assets to American Metal Finishers in exchange for American Metal Finishers’ assumption of a loan obligation to Chase Manhattan Bank in the sum of $205,735.38, as well as the assumption of other obligations including past due wages, public utility debts and payroll taxes owed to the Internal Revenue Service. While the decision does not state whether Crown-Bastell’s debt to Chase Manhattan secured by the perfected security was in default, “The nonpayment of payroll taxes had resulted in the placement by the Internal Revenue Service of a lien on Crown’s property * * * and in the padlocking of the warehouse and Crown’s manufacturing facility.” (Supra, at 500.) Palleschi challenged the transfer to American Metal Finishers citing the Bulk Transfers Act.
“Palleschi argues that the ‘transfer in settlement’ herein was not of the kind contemplated by section 6-103 because it was not made to the secured party (the bank) but to a third party (American), and that the latter’s arrangements with the bank (including the assumption of the indebtedness), which resulted in the bank’s delivery of a release to the debtor, are irrelevant (citing as authority therefor Starman v John Wolfe, Inc., 490 SW2d 377 [Mo, 1973]).
“The chief rationale of the Bulk Transfers article is the avoidance of the ‘major bulk sales risk’ of ‘[t]he merchant, owing debts, who sells out his stock in trade * * * pockets the proceeds, and disappears leaving his creditors unpaid’ (Official *779 Comment, McKinney’s Cons Laws of NY, Book 62½, Uniform Commercial Code, § 6-101, p 717). But where the transfer is in settlement of a lien or security interest, there are not cash proceeds with which the seller could abscond. Thus, where the consideration is settlement of an indebtedness with no receipt of cash proceeds, the protective purposes of the Bulk Transfers article do not apply.” (American Metal Finishers v Palleschi, supra, at 501.)
Defendants argue that inasmuch as the facts of this case do not conform to the scenario described by the Court in American Metal Finishers (supra) as the “major bulk sales risk,” the transaction should be considered exempt under section 6-103 (3).
The scenario characterized by the Court in American Metal Finishers (supra) as the “major bulk sales risk” is only one of “two common forms of commercial fraud” identified by drafters of the Bulk Transfers Act. (UCC 6-101, Comment 2.) The other, listed first in the Comment, is: “The merchant, owing debts, who sells out his stock in trade to a friend for less than it is worth, pays his creditors less than he owes them, and hopes to come back into the business through the back door some time in the future.” (UCC 6-101, Comment 2 [a].) Here Distribution Corp. entered into employment contracts with Cigar Company’s chief executive officer, Lawrence Aronson, and its vice-president for sales and purchasing, Joel Spielvogel. The Aron-son contract had a term of three years with a base salary of $250,000 plus other substantial compensation and the Spielvogel contract a two-year term with a base salary of $200,000 with provisions for additional compensation. It is unnecessary for the purposes of this proceeding to determine whether such compensation was fair and reasonable. It is sufficient that the device of such employment contracts provides an opportunity for the principals of a corporate debtor “to come back into the business through the back door” after the assets of an enterprise have been sold and creditors have received less than they were owed. A determination that the transaction in question was actually fraudulent is not a prerequisite to a finding that the Bulk Transfers Article is applicable. (Stone’s Pharmacy v Pharmacy Accounting Mgt., 812 F2d 1063 [8th Cir 1987], supra.)
Weighing the various factors which courts have determined to be relevant in deciding whether a particular transaction is *780 exempt from the Bulk Transfers Article under UCC 6-103 (3), this court determines that the sale here challenged is not exempt. The creditors were entitled to notice which was not given.